**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-1789

**PRO-POLICE RALLY COLORADO,** a nonprofit Colorado corporation, on behalf of itself, its members, and the attendees at the rally it hosted;
**RON MACLACHLAN, JR., CASPER STOCKHAM**, **MICHELLE MALKIN**, **LAUREL IMER**, **ETHAN JONES**, **JULIE HAYDEN-BONNIWELL**, **GARY HODGES**, **JOHN DOES 1-100 and JANE DOES 1-100**,

*Plaintiffs*,

v.

**MAYOR MICHAEL HANCOCK**, in both his individual capacity and official capacity as Mayor for the City and County of Denver;
**MURPHY ROBINSON**, in his individual capacity as then acting Manager of the Department of Public Safety;
**PAUL PAZEN**, in both his individual capacity and official capacity as Chief of Police for the Denver Police Department;
**AARON SANCHEZ**, in both his individual capacity and official capacity as Division Chief for the Denver Police Department;
**ROBERT WYKOFF**, in both his individual capacity and official capacity as a Lieutenant for the Denver Police Department;
**RON THOMAS**, in both his individual capacity and official capacity as Division Chief for the Denver Police Department;
**JULIE WHEATON**, in both her individual capacity and official capacity as Lieutenant for the Denver Police Department;
**ROSE WATTS**, in both her individual capacity and official capacity as Deputy Director of the Office of Special Events for the City and County of Denver;
**ALLEGRA HAPPY HAYNES**, in both her individual capacity and official capacity as Manager of Denver Parks and Recreation;
**AFRO-LIBERATION FRONT**,
**PARTY FOR SOCIALISM AND LIBERATION-DENVER**,
**AURORA COPWATCH**, **DENVER HOMELESS OUTLOUD**,
**LILLIAN HOUSE**, an individual; **CARYN SODARO**, an individual; **SHERRIE SMITH**, an individual; **JOHN DOES** 1-100 and **JANE DOES** 1-100.

*Defendants*.

---

**COMPLAINT**

---

PRO-POLICE RALLY COLORADO, a nonprofit Colorado corporation (on behalf of itself, its members, and the attendees at the rally it hosted), RON MACLACHLAN, JR., CASPER STOCKHAM, MICHELLE MALKIN, LAUREL IMER, ETHAN JONES, JULIE HAYDEN-BONNIWELL, GARY HODGES, (hereinafter "Plaintiffs"), by and through undersigned counsel, respectfully submit their Complaint as follows:

## NATURE OF THE CASE

1. This is a suit challenging the actions of some Denver police officers, their supervisors and administrators, city officials and others who, through their conduct, conspired with and empowered known anarcho-tyrants and others, people who believe in using violence, intimidation, and fear to expropriate the First Amendment rights of citizens who stand for freedom, God. and country.

## JURISDICTION AND VENUE

2. This case arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§1983, 1985, 1986 and 1988.

3. This Court has jurisdiction over the claims asserted pursuant to 42 U.S.C. §1983 and 28 U.S.C. §§1331 and 1343.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

5. Plaintiff, PRO-POLICE RALLY COLORADO, is a nonprofit Colorado corporation operating out of Denver County in good standing ("PPRCO") which strives to strengthen the relationship between Colorado communities and law enforcement officers. As a

grass roots non-partisan movement, PPRCO seeks to bring together community organizations and like-minded individuals for the support of local law enforcement while empowering the community with a united voice. Between 2015 and 2019 and in 2022, the third Sunday in July has been declared Law Enforcement Appreciation Day by proclamation of the sitting Governor.

6. In Colorado, Law Enforcement Appreciation Day exists because of the efforts of PPRCO and its members. Through Back the Blue events, which PPRCO holds in numerous locations across Colorado and elsewhere, law enforcement officers are recognized and celebrated for their unyielding commitment to serving communities throughout Colorado. PPRCO sues on its own behalf and on behalf of members and/or attendees, one or more who have standing to sue in their own right, who were also present for PPRCO's 6th Annual Back the Blue Event in Denver, Colorado on July 19, 2020 ("2020 BTB Event"), and PPRCO's 7th Annual Back the Blue Event in Denver, Colorado on July 18, 2021 ("2021 BTB Event").

7. PPRCO also sues on its own behalf and on behalf of members and/or potential attendees, one or more who have standing to sue in their own right, who were unable to attend the 8th Annual Back the Blue Event in Denver, Colorado on July 17, 2022 ("2022 BTB Event"), because the Office of Special Events for the City and County of Denver ("OSE") and Denver Parks and Recreation ("Denver Parks") denied PPRCO's permit. The claims PPRCO raises on behalf of members and/or attendees are germane to its purpose, and neither the claims asserted herein nor the relief requested requires the participation of individual members.

8. Plaintiff, RON MACLACHLAN, JR., is a natural person and resident of Denver County, Colorado. Mr. MacLachlan is the founder of PPRCO and is the permit holder for every BTB Event, on behalf of PPRCO. Mr. MacLachlan was in attendance at the 2020 and

2021 BTB Events. He was unable to attend the 2022 BTB Event after DPR and OSE denied PPRCO's permit. Mr. MacLachlan received a serious head injury at the 2020 BTB Event.

9. Plaintiff, CASPER STOCKHAM, is a natural person and resident of Arapahoe County, Colorado. Casper Stockham ("Candidate Stockham") attended the 2020 BTB Event and was scheduled to speak regarding his candidacy for United States House of Representatives for Colorado's 7th Congressional District. Candidate Stockham was censored as a result of rioters who overtook the 2020 BTB Event. He was also surrounded and aggressively intimidated by rioters including having his hat knocked off of his head.

10. Plaintiff, MICHELLE MALKIN, is a natural person and resident of El Paso County, Colorado. Mrs. Malkin's parents were immigrants who came to this country legally to secure the American dream. She is a first generation American. Mrs. Malkin's grandfather was a police officer in the Philippines. She believes in law enforcement and was excited to show support for the hard work these men and women do each day in communities across America and, specifically, Colorado. She attended the 2020 BTB Event and was scheduled to speak. Mrs. Malkin was censored as a result of rioters who overtook the 2020 BTB Event. During the 2020 BTB Event, Mrs. Malkin was assaulted and terrorized. She witnessed acts of violence that have caused her anxiety, fear, and apprehension of public speaking, a staple in her career and public life.

11. Plaintiff, LAUREL IMER, is a natural person and resident of Jefferson County, Colorado. Laurel Imer ("Candidate Imer") was in attendance at the 2020 BTB Event. She was scheduled to speak regarding her candidacy for the Colorado House of Representatives, District 24. Candidate Imer was censored and violently assaulted by rioters who overtook the 2020

BTB Event.

12. Plaintiff, ETHAN JONES, is a natural person and resident of Arapahoe County, Colorado. Ethan Jones ("Mr. Jones") was in attendance at the 2020 BTB Event with his elderly 75-year-old father. Mr. Jones and his father were unable to participate in the 2020 BTB Event because violent rioters encircled and descended into the Amphitheatre and began assaulting attendees.

13. Plaintiff, JULIE HAYDEN-BONNIWELL, is a natural person and resident of Adams County, Colorado. Julie Hayden-Bonniwell ("Mrs. Hayden") was in attendance at the 2020 BTB Event and suffered physical and emotional injuries as a result.

14. Plaintiff, GARY HODGES, is a natural person and resident of Boulder County, Colorado. Gary Hodges ("Mr. Hodges") was in attendance at the 2020 BTB Event. Mr. Hodges was violently assaulted by the rioters, which resulted in a serious spinal and cervical injury. Mr. Hodges still suffers from emotional trauma from the 2020 BTB Event.

15. Plaintiffs, JOHN and JANE DOES 1-100, are natural persons whose identities are not yet known, but whose identities may be developed through ongoing investigation and discovery and who may have incurred damages and, therefore, are hereby put on notice of the existence of the following claims.

16. All Plaintiffs suffered deprivation of their Constitutional rights to peacefully associate and assemble, to hear, and to be heard.

17. Defendant, MAYOR MICHAEL HANCOCK, is a natural person and the Mayor of Denver, Colorado. Mayor Hancock is the Chief Executive of the City of Denver who oversees operations of the other identified agencies and officials. He is sued in both his

individual and official capacities.

18. Defendant, MURPHY ROBINSON, is a natural person and was the acting Manager of the Denver Department of Public Safety. Mr. Robinson was the intermediary between Chief Pazen and Mayor Hancock. He is sued in his individual capacity.

19. Defendant, PAUL PAZEN, is a natural person and the Chief of the Denver Police Department. Chief Pazen directed the actions of the Denver Police Department. He is sued in both his individual and official capacities.

20. Defendant, AARON SANCHEZ, is a natural person and a Division Chief with the Denver Police Department. Division Chief Sanchez was the on-the-ground commander for the 2020 and 2021 BTB Events and spoke directly with Mr. McLachlan. He is sued in both his individual and official capacities.

21. Defendant, ROBERT WYKOFF, is a natural person and a Lieutenant for the Denver Police Department. Lieutenant Wykoff was in related meetings prior to, and issued both the stand-down and retreat orders for, the 2020 BTB Event. He is sued in both his individual and official capacities.

22. Defendant, RON THOMAS, is a natural person and a Division Chief for the Denver Police Department. Division Chief Thomas was in the meeting with Robert Wykoff and Julie Wheaton prior to the 2020 BTB Event. He is sued in both his individual and official capacities.

23. Defendant, JULIE WHEATON, is a natural person and a Lieutenant for the Denver Police Department. Lieutenant Wheaton was in the meeting with Robert Wykoff and Ron Thomas prior to the 2020 BTB Event. She is sued in both her individual and official

capacities.

24. Defendant, ROSE WATTS, is a natural person and the Deputy Director of the Office of Special Events for the City and County of Denver. Deputy Director Watts is the point person from the OSE who ultimately denied the 2022 BTB Event permit. She is sued in both her individual and official capacities.

25. Defendant, ALLEGRA RENE "HAPPY" HAYNES, is a natural person and the Manager of Denver Parks and Recreation. Manager Haynes is, upon information and belief, responsible for the rules and regulations involved in the permitting process for the BTB events. She is sued in both her individual and official capacities.

26. Defendant, AFRO-LIBERATION FRONT, is a protest group that, upon information and belief, operates out of Denver County and provided organization, equipment, weapons, people and other support to protestors and rioters at and against the BTB 2020 Event.

27. Defendant, PARTY FOR SOCIALISM AND LIBERATION-DENVER, is an organization that, upon information and belief, operates out of Denver County and elsewhere, trains "revolutionaries," and provided organization, equipment, weapons, people and other support to protestors and rioters at and against the BTB 2020 Event.

28. Defendant, AURORA COPWATCH, is a group founded in 2004 that operates out of Aurora, Colorado to, upon information and belief, document police misconduct in a "peaceful, non-violent" way and provided organization, equipment, weapons, people and other support to protestors and rioters at and against the BTB 2020 Event.

29. Defendant, DENVER HOMELESS OUTLOUD, is a non-profit corporation that operates out of Denver and, upon information and belief, provided organization, equipment,

weapons, people and other support to protestors and rioters at and against the BTB 2020 Event.

30. Defendant, LILLIAN HOUSE, is a natural person and, upon information and belief, a resident of Denver County who, upon information and belief, protested and rioted at and against the BTB 2020 Event.

31. Defendant, CARYN SODARO, is a natural person and upon information and belief, a resident of Adams County who, upon information and belief, protested and rioted at and against the BTB 2020 Event

32. Defendant, SHERRIE SMITH, is a natural person and, upon information and belief, a resident of El Paso County who, upon information and belief, protested and rioted at and against the BTB 2020 Event.

33. Defendants JOHN and JANE DOES 1-100 are natural persons whose identities are not yet known who, upon information and belief, protested and rioted at and against the BTB 2020 Event, and whose identities may be developed through ongoing investigation and discovery and are, therefore, hereby put on notice of the existence of the following claims.

**FACTS AND LEGAL AUTHORITY**

34. On July 22, 2020, Nick Rodgers, President, Denver Police Protective Association, said:

> "We as police officers are not able to root for one side or the other. We are not allowed to let one side win. But guess what, we did on Sunday. For that we were wrong. For that an apology should be made, to…every person that was there."

35. The Operations Manual for Denver Police contains a Code of Ethics. It states:

> "As a law enforcement officer, my fundamental duty is to serve mankind, safeguard lives, property and protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder."

36. On Sunday July 19, 2020, Denver police officers violated their own Code of

Ethics and oath of office when they stood by and allowed radical protestors to silence the attendees of the 2020 BTB Event through acts of violence, intimidation, and harassment.

37. Beginning after the George Floyd incident in May of 2020 and continuing throughout the summer of 2020, the city of Denver was a war zone. People were assaulted and injured, windows were shattered, businesses were forced to close, and the Capitol was virtually unrecognizable.

38. The DPD was restrained[1] for the month of June 2020 from using non-lethal weapons by a Federal Judge, citing to numerous injuries occurring from Kinetic Impact Projectiles and other non or less-lethal projectiles.

**Days Prior to the 2020 Back the Blue Event**

39. Since 2014, the third Sunday in July has been declared Law Enforcement Appreciation Day. Mr. MacLachlan has had a permit granted each year by Denver Parks and Recreation ("Denver Parks") to hold his BTB Event at the Greek Amphitheatre in Civic Center Park ("Amphitheatre").

40. Because Mr. MacLachlan has used the Amphitheatre each year on the third Sunday in July, he has been granted historical status. Historical status means PPRCO has the first right of refusal to the Amphitheatre reservation each year for its event on the third Sunday in July.

41. Mr. MacLachlan began the permitting process with Denver Parks in September of 2019 for the July 19, 2020 permit. *See* Exhibit 1, a true and correct copy of the 2020 BTB

[1] https://www.9news.com/article/news/local/judge-extends-restraining-order-limiting-denver-police-officers-use-of-less-lethal-weapons/73-eb027d89-9f42-4fda-b0e2-6d9caee611de

Event Permit Issued by Denver Parks.

42. Mr. MacLachlan sought to hold his Sixth Annual BTB Event on July 19, 2020.

43. On July 14, 2020, in the midst of COVID lockdowns, emergency declarations, and violent riots in Denver, Denver Parks issued Mr. MacLachlan a permit for the 2020 BTB Event.

**Three Days Prior to the 2020 BTB Event**

44. On July 16, 2020, less than 3 days prior to the 2020 BTB event, Mr. MacLachlan received a phone call from Chief Pazen's office requesting an in-person meeting. Mr. MacLachlan arrived around 1:30 pm and met with Lieutenant Wheaton, Lieutenant Wykoff, and Deputy Chief Thomas (collectively the "Three Officers").

45. The purpose of the meeting was to request Mr. MacLachlan stand down and not hold the BTB Event. The Three Officers let Mr. MacLachlan know that each night since the George Floyd incident, violent rioters had been terrorizing various communities around Denver. Approximately 74 police officers had been injured and over a million dollars in property damage had occurred.

46. Then the Three Officers requested he relocate the event to another location, possibly the Pepsi Center (now Ball Arena). However, Mr. MacLachlan responded that his insurance policy for the 2020 BTB Event was site specific and non-transferable.

47. Denver Parks and D.R.M.C. 39-72(2) requires insurance if there will be "amplified music." Because Mr. MacLachlan had a band scheduled to play, he was required to have insurance. Had Mr. MacLachlan moved the event he would have lost insurance coverage and Denver Parks would have revoked his permit.

48. Next, Lieutenant Wheaton requested Mr. MacLachlan consider the perspective of the rioters. Mr. MacLachlan responded that he has a right to freedom of expression, whether or not the message is met by a hostile crowd. He reiterated that he would not stand down due to the threats of violence from extremists.

49. The Three Officers let Mr. MacLachlan know that they were unable to stop him from having the event. However, the Three Officers showed Mr. MacLachlan various social media posts where potentially violent protests against his event were already forming. The organizers were distributing events titled "No Party for the Pigs" and stated their sole intention was to "stop the [BTB] event."

50. Before he left, Mr. MacLachlan requested fencing from the Three Officers in response to their concerns regarding violence from rioters intent on organizing a protest to shut the BTB event down. The Three Officers denied his request, responding "they will just jump them."

51. After leaving the meeting with the Three Officers, Chief Pazen personally called Mr. MacLachlan to attempt to persuade him to stand down on the BTB event. Chief Pazen begged Mr. MacLachlan to stop the event because "it will set us back." Chief Pazen was referring to the costly destruction which preceded the BTB event in May and June of 2020, which injured 74 officers and caused over a million dollars of damage to the city. Mr. MacLachlan said he would think about it and call him the next day.

52. When Mr. MacLachlan called Chief Pazen on July 17, 2020, he communicated his intent to hold the BTB Event and not acquiesce to the violence of extremists. Chief Pazen stated he "was disappointed."

53. Chief Pazen's desire to censor the 2020 BTB event is unsurprising considering his summer of 2020 campaign of marching[2], in uniform, with Black Lives Matter supporters.



Denver Police Chief Paul Pazen marches with protesters during the fifth day of demonstrations against the death of George Floyd in Denver on Monday, June 1, 2020. (Hart Van Denburg/CPR News)

[2] https://www.cbsnews.com/colorado/news/paul-pazen-denver-police-chief-marches-peaceful-protesters/




54. Chief Pazen reports directly to the Manager of Public Safety, who reports to Mayor Michael Hancock ("Mayor Hancock"). Mayor Hancock also took a very public stance in support of Black Lives Matter protestors.[3,4]

---

[3] https://apnews.com/article/e983220badf7f7ac8064f77b5e6994df

[4] https://krdo.com/news/top-stories/2020/06/03/denver-mayor-marches-with-protesters-after-floyds-death/




Denver Mayor Michael Hancock joined the group and clapped as protesters chanted, "Black lives matter." Hancock, who is black, thanked those who have been demonstrating peacefully and locked arms with protesters during a march through downtown.

**2020 Back the Blue Event**

55. The 2020 BTB event lasted for roughly 15 minutes before groups of rioters descended upon the Amphitheatre and surrounded it. The rioters began by drowning out the music and speech with bullhorns, pots and pans, chants and whistles. Violence soon broke out after the rioters stormed the stage.

56. The night before the 2020 BTB event, numerous reports came to Mr. MacLachlan that the Rioters were at the Capitol staging and planning their attack.

57. Upon information and belief, a representative from Mayor Hancock's office met with the Rioters at the Capitol the night before the 2020 BTB Event and let them know the

"Mayor supports what you are doing" and "believes in your cause." Upon information and belief, this same representative was terminated from the Mayor's office three or four months after the 2020 BTB Event.

58. On the day of the 2020 BTB Event at 12:30 pm, Lieutenant Wykoff texted Mr. MacLachlan and said "please think about our discussion. I don't want your group to be put in a bad spot." *See* Exhibit 2, a true and correct copy of the text message from Lieutenant Wykoff to Mr. MacLachlan.

59. Lieutenant Wykoff failed to mention that he would be Incident Command for the 2020 BTB Event and would order his officers to retreat and stand down when the Rioters attacked.

60. Publicly, extremist groups such as Aurora Copwatch, Denver Homeless Out Loud, the Afro-Liberation Front, and the Party for Socialism and Liberation - Denver (collectively the "Rioters") have taken ownership over the organizing and subsequent events which occurred on July 19, 2020 at the BTB Event. The Rioters marched from the west lawn of the Denver Capitol ("Capitol") to the Greek Amphitheatre in Civic Center Park ("Amphitheatre") with the sole intention to commit acts of violence and terrorize Coloradans exercising their constitutional rights to the free exercise of speech, association, and assembly.

61. Denver police officers watched both from overhead via cameras and helicopters and on the ground as hundreds of violent protestors, with their faces concealed, obstructed two major thoroughfares to descend upon families, children, and elderly people who were gathered to show their love, support and appreciation for law enforcement officers across Colorado.

62. Many of the Rioters were dressed in para-military gear and trained to be part of

alt-left militias.

63. Below is a recent mugshot of Sherrie Smith after she was arrested for her role[5] in a riot which took place in front of a Colorado Springs Police Sergeant's home. Upon information and belief, Ms. Smith was present at the 2020 BTB Event.




64. Below are side by side images of Sherrie Smith pictured on behalf of the Front

[5] https://coloradosprings.gov/police-department/article/news/arrests-august-3rd-riot-pulpit-rock

Range Redneck Revolt[6] and her alleged twitter account detailing her reaction to a terrified Michelle Malkin as the Rioters stormed the stage in para-military gear.




[6] Redneck Revolt is an American far-left political group that organizes predominantly among white working-class people. The group supports gun rights and members often openly carry firearms.

65. Lillian House, an organizer for the Party for Socialism and Liberation took credit for organizing the Rioters, stating that celebrating the police is "unacceptable."[7] Upon information and belief, Ms. House was present at the 2020 BTB Event.

66. Lillian House recently had multiple felonies dismissed for inciting a violent riot at an Aurora police station[8] and holding multiple police officers hostage.

67. Instead of forming skirmish lines to block the Rioters from the BTB Event, DPD Officers authorized the Rioters to encircle the Amphitheatre and occlude egress of the 2020 BTB Event attendees.

68. When members of the Denver Gang Unit, who were stationed blocks away from the Capitol, requested permission from Lieutenant Wykoff at Incident Command to intercept the violent protestors, the Gang Unit was told to stand down.

69. The Rioters used megaphones and bullhorns to scream obscenities, they banged pots and pans and blew whistles, to silence the 2020 BTB event speech.

70. Rioter Caryn Sodaro was arrested by Denver police for physically assaulting a woman and throwing her to the ground. Upon information and belief, her charges were dismissed.

71. When Rioters, who vastly outnumbered the innocent and peaceful Coloradans celebrating the 6th Annual Law Enforcement Appreciation Day, began to descend down into the Amphitheatre, Lieutenant Wykoff issued the final, punishing blow by giving the order for

---

[7] https://www.canoncitydailyrecord.com/2020/07/19/pro-police-rally-denver-cific-center-counter-protest/

[8] https://www.westword.com/news/elijah-mcclain-protest-leaders-psl-aurora-justice-court-arrest-11942775

officers to retreat.

72. As Rioters rushed the stage and, in some cases, assaulted the 2020 BTB Event attendees, one heroic S.W.A.T. Lieutenant disregarded Lieutenant Wykoff's cowardly command and led his team into the Amphitheatre. Because this S.W.A.T. Lieutenant chose to uphold his oath of office, no one was killed. However, property was damaged and numerous people were injured.

**Ron MacLachlan, Jr.**

73. At the 2020 BTB event, in front of various Denver police officers, Mr. MacLachlan was struck across the right side of his head with a longboard. He was also struck repeatedly over the head by a megaphone. Mr. MacLachlan suffered swelling, contusions, wounds, and headaches as a result of his physical assault. Since the 2020 BTB Event, Mr. MacLachlan has suffered from headaches and tinnitus in his right ear.

**Casper Stockham**

74. Candidate Stockham was scheduled to speak about his candidacy for United States Congress at the 2020 BTB Event. He had advertised through his campaign and social media regarding his speaking engagement at the 2020 BTB Event. Mrs. Malkin had also tweeted to her 2 million+ followers about Candidate Stockham speaking at the 2020 BTB Event.

75. Candidate Stockham's speech never took place due to the Rioters censoring the event through noise, intimidation, violence, and hate speech.

76. The Rioters aggressively intimidated Candidate Stockham including screaming in his face and knocking his hat from his head.

**Michelle Malkin**

77. Mrs. Malkin was scheduled to speak at the 2020 BTB event. Her speech never happened due to the Rioters completely censoring the event through noise, intimidation, violence, and hate speech.

78. Mrs. Malkin was also assaulted on stage by the Rioters, who pushed and shoved her when they stormed the stage. She was sprayed in the face with silly string and was threatened with a collapsible baton by, upon information and belief, Defendant Sherrie Smith, a known violent extremist who was dressed in para-military gear.

79. Mrs. Malkin fled out of the back of the Amphitheatre, without her shoe, and jumped into a stranger's vehicle to leave the scene.

80. Since the 2020 BTB Event, Mrs. Malkin has suffered emotional and psychological harm from the fear and terror of what occurred that day. Due to what happened to Mrs. Malkin, her husband will not support Mrs. Malkin speaking publicly in Denver ever again.

81. Mrs. Malkin has always participated in grassroots rallies because she loves Colorado and civic engagement. The 2020 BTB Event had a grossly unjust chilling effect to her and others' First Amendment rights to speak, associate, and assemble.

**Laurel Imer**

82. Candidate Imer was on stage at the 2020 BTB event when Rioters stormed the stage and began assaulting 2020 BTB event attendees. Candidate Imer helped to usher attendees to safety once the Rioters breached the stage from all sides.

83. Candidate Imer jumped in front of Mrs. Malkin in order to protect her from

oncoming aggressor who then proceeded to violently assault Candidate Imer. Candidate Imer was eventually shoved down the stage steps landing on the concrete in front of a Denver police officer. The officer rendered no aid and took no action against the violent assault, which occurred in front of his face.

84. As Candidate Imer lay on the ground listening to screams for help from the 2020 BTB event attendees, she watched as Denver police officers took no action.

85. As a result of multiple and directed physical attacks, Candidate Imer sustained a lifelong permanent injury to her right leg.

86. Candidate Imer further suffers from emotional injuries due to the extreme fear and terror she felt that day.

**Ethan Jones**

87. Ethan Jones, who is an Emergency Medical Technician, was off duty and in attendance at the 2020 BTB Event with his elderly 75-year-old father, who thought it would be a family friendly event. Mr. Jones decided to join his father as he was made aware that there might be an Antifa/BLM-style attack.

88. Moments after the 2020 BTB Event began, hundreds of Rioters encircled the Amphitheatre and completely drowned out the speakers on stage and the band. Chaos ensued as the Rioters descended into the Amphitheatre and began assaulting people and damaging property.

89. Mr. Jones was assaulted twice at that event by same person. He was hit across the chest with a longboard trying to protect his father. He was struck again in the face by the same assaulter just beneath his left eye while rendering aid to injured civilians.

90. In addition to his physical injuries, Mr. Jones suffered mental and emotional injuries from the actions of the Rioters.

**Julie Hayden-Bonniwell**

91. Julie Hayden-Bonniwell, who is a former new reporter, was in attendance at the 2020 BTB Event. She was on stage when Rioters stormed the stage and began assaulting 2020 BTB Event attendees.

92. She was punched in the chest by a woman wearing a BLM t-shirt in front of Denver police officers who turned a blind eye as she was assaulted. In addition, she suffered emotional injuries from the actions of the Rioters.

93. In her 20 years of working in media and journalism, including attending multiple high-profile rallies, she has never seen such a blatant disregard for public safety than what she witnessed from the Denver Police Department.

**Gary Hodges**

94. Gary Hodges, went to Civic Center Park to see the destruction of the Capitol as well as the adjacent properties and businesses. Mr. Hodges had recently heard about the vandalism caused by Antifa and Black Lives Matter Supporters.

95. Mr. Hodges was unaware of the 2020 BTB Event. He decided to stay and enjoy the family friendly event complete with food trucks, live music, and guest speakers.

96. Mr. Hodges heard from an attendee that Michelle Malkin was scheduled to speak at the event and he decided to stay to meet her. However, that never occurred.

97. Within minutes of the 2020 BTB Event beginning, Rioters encircled the Amphitheatre and began to descend down into the Event.

98. Mr. Hodges began to usher attendees to safety. As Mr. Hodges was protecting attendees, he was punched in the face and lost consciousness. Which resulted in him falling unimpeded to the concrete. Two attendees helped him to the side of the Amphitheatre and began to pour water on his bleeding face.

99. Mr. Hodges' wife drove him to Urgent Care, where he was suffering from cuts, abrasions, and spinal and cervical injuries. Mr. Hodges' Primary Care Physician requested he see a spine and neck specialist. He received an MRI and underwent numerous physical therapy sessions.

100. In addition to these serious physical injuries, Mr. Hodges has suffered emotional injuries from the violent attack.

101. On July 22, 2020, three days after the BTB event, Nick Rodgers, President of the Denver Police Protective Association ("Mr. Rodgers") appeared on Peter Boyles' radio show[9] with Ms. Malkin. In the raw and heartfelt interview, Mr. Rodgers responded to the tactics used by DPD regarding the 2020 BTB event and said, "I know how we operate. We have done hundreds of protests. Hundreds. And we have never used that tactic before. We failed in our tactics."

102. Mrs. Malkin responded:

> "It is humiliating for ordinary citizens to go to a BTB rally and then watch as their fellow attendees are beaten over the head with longboards and bullhorns. It is humiliating to go to a BTB rally and watch the police officers watch the women be strangled by Antifa people who want police officers dead. And it is a huge disincentive to hold another BTB rally, to risk our lives when police officers follow the orders of police chiefs and elites who don't care that statues are coming down, that the historic America and this nation is literally burning."

---

[9] https://youtu.be/88pF674fqLU

**2021 BTB Permit Process and Event**

103. Mr. MacLachlan began the permitting process for the 2021 BTB Event in September of 2020.

104. On July 2, 2021, prior to issuing Mr. MacLachlan a permit for the 2021 BTB Event, Denver Parks emailed Mr. MacLachlan inquiring about safety concerns regarding the 2021 BTB Event based upon what transpired at the 2020 BTB Event. *See* Exhibit 3, a true and correct copy of email correspondence between Denver Parks, Department of Public Safety, and Mr. MacLachlan.

105. Mr. MacLachlan informed Denver Parks he had been in contact with Commander Mike O'Donnell since June 25, 2021 regarding safety and police logistics for the 2021 BTB Event.

106. Commander Mike O'Donnell emailed Mr. MacLachlan and "strongly recommend[ed] [Mr. MacLachlan use] fencing to separate [2021 BTB Event] participants from any type of counter protests." He asked that Mr. MacLachlan use identifiers for the 2021 BTB Event attendees. This would allow Denver police officers to identify who should be allowed into the event. *See* Exhibit 4, a true and correct copy of email correspondence between Mr. MacLachlan, Commander Mike O'Donnell, and Division Chief Aaron Sanchez dated July 11, 2021.

107. On or about July 12, 2021, Mr. MacLachlan met with Division Chief Sanchez and eight additional officers from District 6. For safety reasons, they requested he purchase fencing for the 2021 BTB Event. Mr. MacLachlan responded that his permit was not conditional on his ability to purchase fencing. Ultimately, Denver Police concluded that Mr.

MacLachlan was not responsible for the costs of fencing and Denver Police would ensure that there was fencing.

108. Division Chief Sanchez also requested Mr. MacLachlan pay for licensed security guards to secure the event. Mr. MacLachlan utilized Benghazi war hero John "Tig" Tiegen and his security personnel for the 2021 BTB Event.

109. The fencing provided for the 2021 BTB Event was so tight that Mr. MacLachlan was unable to have food trucks at the venue or motorcycles, which are both BTB traditions. Many attendees had trouble finding or, in some cases, were unable to find the entrance point into the event due to the tight fencing.

110. Division Chief Sanchez and Commander McDonell's perspectives were a marked shift from the position taken by Lieutenant Wheaton, Lieutenant Wykoff, and Deputy Chief Thomas a year prior, where the Three Officers refused to provide fencing and claimed that the Rioters "would just jump them."

111. On the day of the 2021 BTB Event, Division Chief Sanchez made sure to inform Mr. MacLachlan his thoughts about the Event. He stated that on behalf of Denver police "we do not want your support and we do not want you here."

**2022 BTB Permit Process and Event**

112. Mr. MacLachlan began the permitting process for the 2022 BTB Even in September of 2021. The Office of Special Events ("OSE") had recently been established, and Mr. MacLachlan had to meet the requirements of both Denver Parks and OSE to receive his permit.

113. Allegra Haynes is the Director/Manager of Denver Parks and Recreation.

114. As Manager, she has the power and authority to adopt rules and regulations for the management, operation and control of parks, parkways, mountain parks and other recreational facilities, and for the use and occupancy, management, control, operation, care, repairing and maintenance of all structures and facilities thereon, and all land on which the same are located and operated. *See* D.R.M.C. 39-1(a).

115. The OSE is a recently created office which works in conjunction with Denver Parks.

116. The OSE agreed to waive their fees for the first year.

117. On June 15, 2022, Alyse Neubert from the OSE emailed Mr. MacLachlan and included her Supervisor Rose Watts. Ms. Neubert stated that due to "the nature of the [2022 BTB Event], Mr. MacLachlan had not adequately addressed safety risks in the Emergency Action Plan. *See* Exhibit 5 a true and correct copy of the email between the Denver Office of Special Events and Mr. MacLachlan dated June 15, 2022.

118. On June 21, 2022, Rose Watts sent an email with an attached flyer to the neighborhood representatives around Civic Center Park notifying them of the upcoming 8th Annual Law Enforcement Appreciation Day. *See* Exhibit 6, a true and correct copy of the email between the Denver Office of Special Events and Mr. MacLachlan dated June 21, 2022.

119. On June 27, 2022, after Mr. MacLachlan submitted an Emergency Action Plan, Alyse Neubert again emailed Mr. MacLachlan and included Rose Watts. *See* Exhibit 7, a true and correct copy of the draft safety plan Mr. MacLachlan submitted to the Denver Office of Special Events. Ms. Neubert claimed "a robust plan for your event is needed in order for you to gain approval for a permit." *See* Exhibit 8, a true and correct copy of the email between the

Denver Office of Special Events and Mr. MacLachlan dated June 27, 2022. She went on to say, "the Department of Safety needs to see that you have thought through and are aware of the issues that could arise from an event such as this, as it does pose safety concerns." *Id.*

120. On July 8, 2022, Rose Watts emailed Mr. MacLachlan and stated that after meeting with Denver Parks and Denver Police, the fencing requirement for the 2022 BTB Event permit could not be waived. *See* Exhibit 9, a true and correct copy of the email between the Denver Office of Special Events, Rose Watts and Mr. MacLachlan dated July 8, 2022. Ms. Watts included some fencing companies he could potentially use for this service. *Id.*

121. Mr. MacLachlan received quotes for fencing that ranged between $10,000 to $12,000 for the 2022 BTB Event. Even if Mr. MacLachlan could have paid these exorbitant costs, none of the companies were available on such short notice.

122. On July 13, 2022, Rose Watts emailed Mr. MacLachlan requesting confirmation to refund his deposit, due to the inability to obtain fencing. *See* Exhibit 10, a true and correct copy of the email between the Denver Office of Special Events, Rose Watts and Mr. MacLachlan dated July 13, 2022.

123. In just two short years, Mr. MacLachlan has been completely censored by various government officials working in concert to silence his "unpopular" message.

124. CRS § 18-9-101 "Riot" "Riot means a public disturbance involving an assemblage of three or more persons which by tumultuous and violent conduct creates grave danger of damage or injury to property or persons or substantially obstructs the performance of any governmental function."

**CLAIM 1**

**DEPRIVATION OF FIRST AMENDMENT RIGHTS PURSUANT TO 42 U.S.C. § 1983**

125. Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 124.

126. The First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment to the United States Constitution and enforceable pursuant to 42 U.S.C. § 1983, provides that states may not abridge the freedom of speech.

127. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law…" *See* 42 U.S.C. § 1983.

128. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) (citing *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96, (1972)). "Other principles follow from this precept." *Id*. "In the realm of private speech or expression, government regulation may not favor one speaker over another." *Id*. (citing *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984)). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id*.; *See Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 641–643 (1994).

129. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.; See R.A.V. v. St. Paul,* 505 U.S. 377, 391 (1992)).

130. "Viewpoint discrimination is thus an egregious form of content discrimination." *Id.* "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*; *See Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983).

131. Private persons may be said to act " 'under color of ' state law" if they are "jointly engaged with state officials in the challenged action." *Hall v. Witteman*, 584 F.3d 859, 864 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980)).

132. Plaintiffs had a constitutional right to hold the lawfully-permitted 2020 BTB Event and to engage in speech, association, and assembly activities at the event.

133. Government officials from the Mayor's office, the Office of Public Safety, and/or the Police Department, acting under color of state law, conspired with the private defendants to deprive Plaintiffs of their rights to free speech, association, and assembly under the First Amendment as incorporated and made applicable to the states via the Fourteenth Amendment.

134. Government officials from the Mayor's office, the Office of Public Safety, and/or the Police Department coordinated with private individuals to organize a riot for the sole purpose to prevent the exercise of First Amendment rights to speech, assembly, and association.

135. Pursuant to CRS § 18-9-101(2), a riot means a public disturbance involving an assemblage of three or more persons which by tumultuous and violent conduct creates grave danger of damage or injury to property or persons or substantially obstructs the performance of any governmental function.

136. The Amphitheatre is considered adjacent to the Capitol and included within the State Capitol Buildings Group. C.R.S. § 24-82-105. The City and County of Denver is

required to enforce both the laws of the State and its own ordinances. *Id*. Denver Police Department is further given jurisdiction to enforce the laws of the State. *See* C.R.S. § 24-82-105(2)

137. On information and belief, government officials from the Mayor's office, the Office of Public Safety, and/or the Police Department gave express support and permission to the private Defendants along with John Does 1-100 and Jane Does 1-100 to prevent the 2020 BTB Event and/or to allow force, intimidation, or threats to shut-down and censor the 2020 BTB.

138. Government officials from the Mayor's office, the Office of Public Safety, and/or the Police Department further sought to prevent the 2020 BTB Event through coercion and interference.

139. Government officials worked in concert with private individuals to censor the message of the 2020 BTB Event.

140. The actions of the governmental defendants were not narrowly tailored to achieve a compelling state interest.

141. The Amphitheatre is "the archetype of a traditional public forum" and PPRCO held a lawful permit for the 2020 BTB Event. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (citations omitted).

142. The government officials engaged in content discrimination and viewpoint discrimination when they censored the 2020 BTB Event.

143. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.;*

*See R.A.V. v. St. Paul,* 505 U.S. 377, 391 (1992)).

144. Defendants' deprivation of Plaintiffs' constitutional rights caused Plaintiffs damages.

145. Defendants acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiffs of their Constitutional Rights, and are therefore subject to punitive damages.

**CLAIM 2**

**CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS – DEPRIVING PERSONS OF RIGHTS OR PRIVILEGES PURSUANT TO 42 U.S.C. 1985(3)**

146. Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 124.

147. Pursuant to 42 U.S.C. § 1985(3), "…if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

148. Pursuant to D.R.M.C. § 38-2, "it shall be unlawful for any person to conspire

with any other person to commit any act which is a violation of a provision of this Code."

149. The 2020 BTB Event included 1 speaker who was actively running for federal office (as well as 4 speakers who were actively running for state office). Speakers were scheduled to speak about their candidacy and their support of law enforcement officials.

150. Republican Candidate Casper Stockham was in attendance and scheduled to speak at 4:15 pm. Candidate Stockham planned to speak about his bid for Colorado's 7th Congressional District.

151. Prior to the BTB event, Mr. MacLachlan gave the speaker list to DPD Commander Sanchez and thus DPD was on notice that Candidate Stockham was a scheduled speaker.

152. On July 18, 2020, Mrs. Malkin further advertised Candidate Stockham's appearance[10] on her personal twitter handle @michellemalkin. Mrs. Malkin has 2 million+ Twitter followers.

153. Among the attendees at the 2020 BTB Event were U.S. Citizens who attended in order to lend their support to federal candidate Stockham.

154. Through the use of force, intimidation, or threat, the private defendants sought do, and in fact did, prevent speakers from speaking at the 2020 BTB Event, including federal Candidate Stockham, and thereby conspired to prevent U.S. citizens from lending their support and advocacy to a candidate for federal office.

155. On information and belief, the private defendants collaborated with government

---

[10] https://mobile.twitter.com/michellemalkin/status/1284511295983648769

officials from the Mayor's office, the Department of Public Safety and/or the Denver Police Department, or both, to prevent the 2020 BTB Event and/or to allow force, intimidation, or threats to disrupt it.

156. As a direct consequence of the force, intimidation, and threats, U.S. Citizens lending their support and advocacy to a candidate for federal office were injured in both person and property on account of their support or advocacy.

157. Defendants acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiffs of their Constitutional Rights, and are therefore subject to punitive damages.

**CLAIM 3**

**VIOLATION OF FIRST AMENDMENT – ONEROUS CONDITIONS PURSUANT TO 42 U.S.C. § 1983**

158. Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through end of facts section.

159. "Although there is a 'heavy presumption' against the validity of a prior restraint, *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70 (1963), the Court has recognized that government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a march, parade, or rally, *see Cox v. New Hampshire,* 312 U.S. 569, 574–576 (1941). *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

160. "Such a scheme, however, must meet certain constitutional requirements. It may not delegate overly broad licensing discretion to a government official. Further, any permit scheme controlling the time, place, and manner of speech must not be based on

the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Id.*; *See United States v. Grace*, 461 U.S. 171, 177 (1983).

161. A government regulation that allows arbitrary application is "inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." *Id.* (citations omitted).

162. To curtail that risk, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license" must contain "narrow, objective, and definite standards to guide the licensing authority." *Id.* (citations omitted).

163. The reasoning is simple: If the permit scheme "involves appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut,* 310 U.S. 296, 305 (1940), by the licensing authority, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great" to be permitted, *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). *Id.* at 131.

164. Denver Parks and OSE collaborating with the Denver Police Department unilaterally imposed an onerous financial burden on Mr. MacLachlan and PPRCO when it conditioned approval of the 2022 BTB Event permit on an expensive onerous condition.

165. Denver Parks and OSE collaborating with the Denver Police Department, knew or should have known it was highly unlikely Mr. MacLachlan could pay $10,000 and find a large amount of fencing one week prior to the 2022 BTB Event.

166. The financial burden was so onerous that Mr. MacLachlan had to cancel the

2022 BTB Event 3 days prior to the Event.

167. On the scheduled day of the 2022 BTB Event, Mr. MacLachlan drove by the Amphitheatre and saw that it had been fenced.

168. Denver Parks and OSE collaborating with the Denver Police Department are unable to impose onerous financial burdens and conditions based upon the content of the speech and the potential for a hostile crowd.

169. Defendants' deprivation of Plaintiffs' constitutional rights caused Plaintiffs damages.

170. Defendants acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiffs of their Constitutional Rights, and are therefore subject to punitive damages.

**CLAIM 4**

**VIOLATION OF FIRST AMENDMENT- RETALIATION OF SPEECH PURSUANT TO 42 U.S.C. § 1983**

171. Plaintiffs hereby reiterate and adopt each and every allegation in the preceding paragraphs numbered 1 through 124.

172. The Supreme Court has recognized that "[i]n places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).

173. The Tenth Circuit examines First Amendment retaliation claims pursuant to *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000), which requires inquiry into whether (1) plaintiffs were engaged in constitutionally protected activity; (2) defendants caused the plaintiffs to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) defendant's actions were motivated by plaintiffs' protected activity. *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1292 (D. Colo. 2020) (citing *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008)).

174. The Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder." *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (citing *Cox v. Louisiana*, 379 U.S. 536, 550 (1965)).

175. D.R.M.C. 39-71 states "[i]t shall be unlawful to hold any scheduled event within the parks of the city unless and until a permit therefor has been issued…"

176. The Amphitheatre is "the archetype of a traditional public forum" and the permitting of the Amphitheater "is a prior restraint on speech." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (citations omitted).

177. Plaintiffs had a constitutional right to hold the lawfully-permitted 2020 BTB Event and to engage in speech, association, and assembly activities at the event.

178. Government officials from the Mayor's office, the Office of Public Safety, and/or the Police Department, acting under color of law, conspired with the private Defendants to deprive Plaintiffs of their rights to free speech, association, and assembly under the First Amendment as incorporated and made applicable to the states via the Fourteenth Amendment.

179. The actions of government officials from the Mayor's office, the Office of Public Safety, and/or the Denver Police Department, acting under color of law caused Plaintiffs significant physical and emotional harm, when the government officials coordinated with private individuals to organize a riot for the sole purpose to prevent the exercise of First Amendment rights to speech, assembly, and association.

180. The actions of government officials from the Mayor's office, the Office of Public Safety, and/or the Denver Police Department have caused Plaintiffs to suffer injuries that would chill a person of ordinary firmness from continuing to engage in that activity.

181. The Denver Police Department, in collaboration with Denver Parks and OSE are retaliating now for the 2020 BTB Event by depraving Plaintiffs of their 2022 First Amendment rights by placing onerous conditions on the content of the speech.

182. Government officials were motivated by the content of Plaintiffs' speech which they have long qualified as the "counterpart to Black Lives Matter" and too politically charged to support. *See* Exhibit 11, a true and correct copy of an email between Denver Police and PPRCO dated June 16, 2016.

183. The actions of all government officials have effectively censored PPRCO and Mr. MacLachlan, as well as the remaining Plaintiffs from continuing to engage in BTB Events.

184. As a direct and proximate result of Defendant's continuing violations of Plaintiffs' rights, Plaintiffs have in the past and will continue to suffer in the future, direct and consequential damages, including but not limited to, the loss of the ability to exercise their constitutional rights.

185. Defendants acted willfully, knowingly and purposefully and/or with deliberate

indifference to deprive Plaintiffs of their Constitutional Rights, and are therefore subject to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A. That this Court issue a judgment declaring that the acts complained of herein violated the United States Constitution;

B. An award of compensatory damages to Plaintiff's in an amount to be determined at trial including damages for pain and suffering;

C. An award of punitive damages based upon the actions of defendants in an amount to be determined at trial;

D. An award of costs of suit and attorneys' fees; and

E. Provide any and such further as the Court deems proper and just.

Respectfully Submitted,

/s/ Randy B. Corporon
Randy B. Corporon
LAW OFFICES OF RANDY B. CORPORON P.C.
2821 S. Parker Road, Suite 555
Aurora, CO 80014
Telephone: (303) 749-0062
FAX: (720) 836-4201
E-mail: rbc@corporonlaw.com

*Attorney for Plaintiffs*